RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0054p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────

CYNTHIA MADEJ; ROBERT MADEJ,

　　　　　　*Plaintiffs-Appellants*,

　　*v.*

JEFF MAIDEN, Athens County Engineer,

　　　　　　*Defendant-Appellee*.

No. 18-4132

─────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:16-cv-00658—Edmund A. Sargus, Jr., District Judge.

Argued:  October 22, 2019

Decided and Filed:  February 24, 2020

Before:  GUY, BUSH, and MURPHY, Circuit Judges.

─────────────

**COUNSEL**

─────────────

**ARGUED:**  David T. Ball, ROSENBERG & BALL CO., LPA, Granville, Ohio, for Appellants. Molly Gwin, ISAAC, WILES, BURKHOLDER & TEETOR, LLC, Columbus, Ohio, for Appellee.  **ON BRIEF:**  David T. Ball, ROSENBERG & BALL CO., LPA, Granville, Ohio, Fazeel S. Khan, HAYNES, KESSLER, MYERS & POSTALAKIS, INC., Worthington, Ohio, for Appellants.  Molly Gwin, Maribeth Meluch, ISAAC, WILES, BURKHOLDER & TEETOR, LLC, Columbus, Ohio, for Appellee.  Donald Horak, DIOCESE OF STEUBENVILLE, Athens, Ohio, for Amici Curiae.

─────────────

**OPINION**

─────────────

MURPHY, Circuit Judge.  Cynthia Madej is very ill.  On top of her other ailments, her doctors say she has "multiple chemical sensitivity."  She thus goes to great lengths to avoid

everyday materials that she believes will trigger harmful reactions like burning eyes and throat, dizziness, or nausea. This suit arose because Ms. Madej fears that the use of asphalt on a road near her home will cause more harm still. She and her husband sued the county engineer to stop the roadwork, alleging violations of the Fair Housing Amendments Act of 1988 and the Americans with Disabilities Act of 1990. Applying the well-known rules from *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the district court excluded the opinions of the Madejs' experts that the asphalt would injure Ms. Madej. Without expert causation evidence, the court added, the Madejs could not withstand summary judgment. As far as we are aware, "no district court has ever found a diagnosis of multiple chemical sensitivity . . . to be sufficiently reliable to pass muster under *Daubert*." *Gabbard v. Linn-Benton Hous. Auth.*, 219 F. Supp. 2d 1130, 1134 (D. Ore. 2002), *aff'd sub nom. Wroncy v. Or. Dep't of Transp.*, 94 F. App'x 559 (9th Cir. 2004). We thus see no abuse of discretion in the district court's evidentiary ruling and affirm its judgment for the county engineer.

I.

Cynthia Madej has suffered through decades of debilitating maladies, including chronic fatigue syndrome, fibromyalgia, anemia, and severe vitamin deficiencies. Since 1997, the Social Security Administration has found her completely disabled and entitled to benefits. Two of her doctors, Barbara Singer (a primary-care physician) and Allan Lieberman (an environmental-medicine specialist), have opined that she also suffers from multiple chemical sensitivity, which is not a disease recognized by the World Health Organization or the American Medical Association. Dr. Lieberman takes the view that the phrase "multiple chemical sensitivity" (like the word "headache") is more description than diagnosis because it conveys that many chemicals negatively affect Ms. Madej's health. Ms. Madej says that she has reacted to countless substances, including fertilizers, pesticides, fragrances, cleaning products, glues, paint, newsprint, polyurethane, varnish, vinyl, gas, oil, propane, rubber, plastics, carpet, wood, and new clothes. Her reactions have included burning eyes and throat, chest tightness, shortness of breath, chronic headaches, nausea, and dizziness.

Ms. Madej takes extraordinary measures to avoid the common materials that trigger these harmful reactions. She is effectively homebound, leaving her home maybe a couple of times per

year, largely for medical appointments.  She also sleeps in a structure on her property that is lined with glass (floors, walls, and ceiling) to avoid the wood in her house.  She stays warm in this glass structure over the winter by using a string of incandescent light bulbs (supplemented by glass bottles filled with hot filtered water on extremely cold nights).

In 2010, given her sensitivities, Ms. Madej and her husband, Robert, moved to a home in rural Athens County, Ohio.  Located some 280 feet off of Dutch Creek Road, their home was built for another individual with chemical sensitivities.  After moving there, the Madejs gave a letter from Dr. Lieberman to the existing Athens County Engineer asking for advance notice of planned chemical sprayings within three blocks of their home.  The letter stated that "[e]xposure to even small doses of" certain substances, including "herb[i]cides, pesticides, fertilizers, oil, road tar, asphalt, diesel exhaust and other petroleum and roadway materials, could create a life-threatening situation [for Ms. Madej]."

A new county engineer, Jeff Maiden, took office in January 2013.  In 2014, when Maiden's office paved a nearby road, Ms. Madej reportedly experienced headaches, throat and eye burning, and chest tightness for months.  So, beginning in the spring of 2015, her husband repeatedly called the office to remind Maiden's staff of his wife's poor health.  Each time, employees responded that the office had no maintenance plans for Dutch Creek Road.

In March 2015, however, dozens of residents had petitioned the county commissioners to improve this pothole-ridden road.  Maiden had also received more complaints about the dust on Dutch Creek Road than the dust on any other road in the county.  When cars drove on the road in the summertime, billowing dust turned nearby foliage brown.  One resident even vandalized a road sign to read "*Dust* Creek Road" rather than "*Dutch* Creek Road."

To address these complaints, Maiden decided to "chip seal" the road.  The chip-seal process helps maintain rural roads and prevent dust.  Workers spray a thin layer of heated asphalt liquid on the surface, place small stones or "chips" on top of the liquid, compress the chips into the liquid, and sweep excess chips off the roadway.

Maiden's staff recalled Ms. Madej having asphalt allergies.  In late August 2015, therefore, an employee informed the Madejs that the office planned to start work on the road the

next day.  The Madejs objected.  Maiden agreed to delay things until after a public meeting at which the Madejs could air their concerns to the community.  That same day, though, workers patched two smaller areas of the road, located a half mile from the Madejs' home.  Even this work reportedly left Ms. Madej feeling ill.

On September 10, the public meeting generated a standing-room-only crowd.  Maiden discussed the roadwork while Mr. Madej explained his wife's poor health.  Neighbors proposed various accommodations—such as paying for the Madejs' hotel or helping them stay at a campsite during the work—to no avail.  Seeing no room for compromise, Maiden chose to start the roadwork on September 14.  The parties dispute whether Mr. Madej had told Maiden at or before this meeting about his research into fixing the road with non-asphalt alternatives to chip seal.  But we will assume that he did so given the case's procedural posture.

On September 15, the Madejs brought a tort suit against Maiden in his official capacity.  A state court granted preliminary relief halting any chip-seal work within a mile of the Madejs' home.  The Madejs later amended their complaint to assert claims under the Fair Housing Amendments Act of 1988 and the Americans with Disabilities Act of 1990.  Maiden removed the suit to federal court.  He then moved to exclude the opinions of the Madejs' three doctors: her two treating doctors (Drs. Singer and Lieberman) and an expert (Dr. John Molot).  Maiden also sought summary judgment on all claims.

The district court initially held that the opinions of the Madejs' doctors did not satisfy the reliability requirements of Federal Rule of Evidence 702.  *Madej v. Maiden*, No. 2:16-cv-658, 2018 WL 5045768, at *4–14 (S.D. Ohio Oct. 17, 2018).  Invoking the causation rules from toxic-tort cases, the court noted that the Madejs must show both general causation (that the asphalt in chip seal can cause the type of injury that a plaintiff alleges) and specific causation (that this asphalt will, in fact, cause Cynthia Madej's injury).  *Id.* at *4–5.  The court found that the doctors did not offer reliable opinions on specific causation: that chip seal would harm Ms. Madej.  *Id.* at *5–14.

The court next held that the Madejs' lack of expert causation evidence warranted summary judgment for Maiden.  *Id.* at *14–16.  It noted that the Fair Housing Amendments Act

requires a reasonable accommodation for a person with a handicap when that accommodation is necessary to give the person an equal opportunity to enjoy a dwelling. *Id.* at *15. Finding that this "necessary" element contains a causation test, the court reasoned that the Madejs could not show that chip seal would harm Ms. Madej and so could not show any need for alternatives. *Id.* The court rejected the Madejs' claim under the Americans with Disabilities Act for an identical reason. *Id.*

The Madejs now appeal the district court's evidentiary ruling and its rejection of their federal claims. They have abandoned their state-law claims. And while they separately challenge the court's rejection of what they call their "injunction" count, an injunction is a remedy, not a claim. If they cannot show "actual success" on their claims, they cannot obtain a permanent injunction. *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012) (citation omitted).

## II.

The opinion testimony of a doctor (whether an expert or a treating physician) generally must pass muster under Rule 702. *See Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009). Before a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may" testify, the party who seeks to call the witness must prove: (1) that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) that "the testimony is based on sufficient facts or data"; (3) that "the testimony is the product of reliable principles and methods"; and (4) that "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d). These factors, in short, require "scientific testimony" to be both "relevant" and "reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). A district court must perform a "gatekeeping role" to ensure that the testimony meets those mandates, *Daubert*, 509 U.S. at 597, and we review its conclusion for an abuse of discretion, *Kumho Tire*, 526 U.S. at 142, 158.

The Madejs assert that the district court committed both relevancy and reliability errors when undertaking this gatekeeping role. As for relevancy, they argue that the district court

mistakenly required them to meet common-law tort standards that do not apply to their federal statutory claims.  As for reliability, they argue that their doctors had a sufficient factual basis for opining that the chip seal would harm Ms. Madej.  Neither argument warrants reversal.

## A.  Relevancy

Rule 702's first condition requires that an "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  *Daubert* tells us that "[t]his condition goes primarily to relevance."  509 U.S. at 591.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Id.* (citation omitted).  Or, as we have said, "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question."  *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).  Whether an opinion "relates to an issue in the case" or helps a jury answer a "specific question" depends on the claims before the court.  Thus, when analyzing the relevancy of expert testimony, a court should consider the elements that a plaintiff must prove.

Here, the Madejs argue that the district court focused on irrelevant causation standards from *state tort law*, not on the standards for their *federal statutory claims*.  They have a point.  The court said things like the following: "In cases involving exposure to toxic substances, the plaintiff 'must establish both general and specific causation through proof that the toxic substance is capable of causing, and did cause, the plaintiff's alleged injury.'"  *Madej v. Maiden*, No. 2:16-cv-658, 2018 WL 5045768, at *4 (S.D. Ohio Oct. 17, 2018) (quoting *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676–77 (6th Cir. 2011)).  But *Pluck* and other cited cases addressed tort claims.  *E.g.*, *Pluck*, 640 F.3d at 674–77.  This is not a toxic-tort case.  It involves claims under the Fair Housing Amendments Act and the Americans with Disabilities Act.

Ultimately, though, the Madejs' argument that the district court wrongly relied on toxic-tort cases does them no good.  When we turn to the federal statutes on which they rely, we are not even sure that the Madejs have stated cognizable claims.  At the least, these statutes require the Madejs to show that the use of chip seal on Dutch Creek Road will cause Ms. Madej harm.

In the end, then, the district court properly asked whether the doctors' opinions were reliable enough to help answer this causation question for these federal claims. *See Berry*, 25 F.3d at 1351.

1. *Fair Housing Amendments Act.* The Madejs allege that the county engineer violated the Fair Housing Amendments Act by rejecting their proposed "reasonable accommodation": using alternatives to chip seal that do not contain asphalt. This Act "amended the Fair Housing Act to bar housing discrimination against the handicapped." *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 489 (6th Cir. 2019) (citing 42 U.S.C. § 3604(f)). Section 3604(f) makes it unlawful "[t]o discriminate against any person . . . in the provision of services or facilities in connection with [a] dwelling, because of a handicap of" that person. 42 U.S.C. § 3604(f)(2)(A). It defines "discrimination" to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B).

Before deciding if the Madejs' claim requires them to prove any type of causation, we must express uncertainty over whether the claim even falls within the Act. As its name implies, the Fair Housing Amendments Act does not bar discrimination in all services; it bars discrimination in the "provision of services or facilities *in connection with [a] dwelling*." *Id.* § 3604(f)(2) (emphasis added). In other contexts, the Supreme Court has viewed the phrase "in connection with" as "essentially 'indeterminat[e]' because connections, like relations, 'stop nowhere.'" *Maracich v. Spears*, 570 U.S. 48, 59 (2013) (citation omitted). The Court has thus told us to read this relational text as adopting the "limiting principle" most "consistent with the structure of the" statute. *Maracich*, 570 U.S. at 60; *see also Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387–88 (2014).

Lower courts have done just that in this housing context. They have refused to extend the Fair Housing Act "to any and every municipal policy or service that touches the lives of residents" because that view would "expand that Act into a civil rights statute of general applicability rather than one dealing with the specific problems of fair housing opportunities." *Ga. State Conference of the NAACP v. City of LaGrange*, 940 F.3d 627, 633 (11th Cir. 2019) (citation omitted). The Fourth Circuit, for example, rejected a claim that public agencies

violated another subsection, 42 U.S.C. § 3604(b), when selecting a new highway's path. *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 192–94 (4th Cir. 1999). The court reasoned that treating the highway siting as a "housing 'service'" was a "strained interpretation of the word." *Id.* at 193 (citation omitted); *see also A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 349–50 (4th Cir. 2011).

Here too, it is not obvious that roadwork on Dutch Creek Road amounts to a "provision of services" "in connection with" the Madejs' home. 42 U.S.C. § 3604(f)(2); *compare Bullock v. City of Covington*, No. 16-56-HRW, 2016 WL 6694486, at *6 (E.D. Ky. Nov. 14, 2016), *aff'd* 698 F. App'x 305 (6th Cir. 2017), *with Vance v. City of Maumee*, 960 F. Supp. 2d 720, 732–33 (N.D. Ohio 2013). Yet the county engineer did not raise this argument on appeal, so we merely flag it for future cases, lest our opinion be taken as impliedly accepting the validity of the Madejs' claim.

Even if the Act applies, the Madejs still must show that their "accommodation" (a chip-seal alternative that does not use asphalt) is "necessary to afford [Ms. Madej] equal opportunity to use and enjoy" her home. 42 U.S.C. § 3604(f)(3)(B). We have noted that this "necessity element" mandates "a causation inquiry that examines whether the requested accommodation or modification would redress injuries that otherwise would prevent a disabled resident from receiving the same enjoyment from the property as a non-disabled person would receive." *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014). In other words, "[n]ecessity functions as a but-for causation requirement, tying the needed accommodation to equal housing opportunity." *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 110 (3d Cir. 2018).

In this case, if the asphalt in chip seal would not cause Ms. Madej's negative reactions, the Madejs could not show that the roadwork would create an unequal opportunity for her to enjoy her home. Without that causal connection, the Madejs' proposed alternatives would also not be necessary (that is, "'indispensable,' 'essential,' something that 'cannot be done without'") to redress what turned out to be non-existent harms. *Davis*, 945 F.3d at 490 (quoting *Cinnamon Hills Youth Crisis Ctr. v. St. George City*, 685 F.3d 917, 923 (10th Cir. 2012)).

2. *Americans with Disabilities Act*. The Madejs also allege that the county engineer violated the Americans with Disabilities Act by refusing their same proposed "reasonable modification": using alternatives to chip seal that do not contain asphalt. Their textual support for this theory has been a moving target. The Americans with Disabilities Act forbids disability discrimination in employment (Title I), public services (Title II), and public accommodations (Title III). The complaint alleged that the use of chip seal violated Title III's reasonable-modification rules for public accommodations. 42 U.S.C. § 12182(b)(2)(A)(ii). But the Act defines "public accommodation" to cover "private entities," not public entities. *Id.* § 12181(7); *Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1036 (6th Cir. 1995). When the county engineer made this point in the district court, the Madejs switched to Title II. On appeal, however, they do not tell us the title on which they rely. We assume they mean to invoke Title II.

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Unlike Title III or the Fair Housing Amendments Act, Title II does not expressly define "discrimination" to include a refusal to make a reasonable accommodation for a person with a disability (in addition to intentional discrimination). *Wis. Cmty. Servs. v. City of Milwaukee*, 465 F.3d 737, 750 (7th Cir. 2006) (en banc). The Attorney General has instead passed a regulation imposing that mandate: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). Like the Attorney General, we have read § 12132 to cover "claims for a reasonable accommodation." *Roell v. Hamilton County*, 870 F.3d 471, 488 (6th Cir. 2017). Yet we have also said that a Title II "plaintiff must show that the defendants intentionally discriminated against him *because* of his disability." *Smith v. City of Troy*, 874 F.3d 938, 947 (6th Cir. 2017). We need not reconcile these cases here, as the county engineer does not challenge the reasonable-modification regulation under the statute. So we take as a given that "discrimination" includes a failure to accommodate.

Even so, it is not clear how the Madejs' claim fits within Title II. Section 12132 indicates that no "qualified individual with a disability" shall "by reason of such disability" (1) "be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity," or (2) "be subjected to discrimination by any such entity." We have read even the "subjected to discrimination" text to require discrimination that "relate[s] to services, programs, or activities" of a public entity. *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998); *cf. Brumfield v. City of Chicago*, 735 F.3d 619, 627–29 (7th Cir. 2013). And we have distinguished the "services, programs, or activities" covered by § 12132 from the noncovered "facilities" in which they are conducted. *Babcock v. Michigan*, 812 F.3d 531, 535–40 (6th Cir. 2016).

How does this caselaw play out here? It is debatable. The Madejs primarily allege that the use of chip seal will deny Ms. Madej the benefits of her home, but her private dwelling is not a "service, program, or activity" of a public entity. When questioned on this point at argument, counsel responded that the roadwork qualifies as a "service" and that the use of chip seal would deny Ms. Madej the "benefit" of the road. Those theories, too, raise difficult interpretive questions. *Babcock* holds that "facilities" (in contrast to "services, programs, or activities") generally are not covered by § 12132, 812 F.3d at 535–40, and regulations define "facility" to include "roads," 28 C.F.R. § 35.104. But *Babcock* involved the "design features in a building" and suggested that those facts might distinguish it from a case that found a transportation facility (a sidewalk) covered. 812 F.3d at 538 n.5 (discussing *Frame v. City of Arlington*, 657 F.3d 215, 221 (5th Cir. 2011) (en banc)). The *Babcock* plaintiff also did not argue (as the Madejs suggested here) that the construction of a facility can itself qualify as a "service." *Id.* Because the county engineer raised none of these issues on appeal, we again merely flag them for future cases and will assume that Title II extends to the denial of the benefits of Dutch Creek Road.

Nevertheless, the Madejs' claim again requires proof of causation. The regulation compels reasonable modifications "when the modifications are *necessary* to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i) (emphasis added). Like the Fair Housing Amendments Act's text, this text "links necessity to a causation inquiry," albeit one with a different object. *Wis. Cmty. Servs.*, 465 F.3d at 752. While the Fair Housing Amendments Act

asks whether an accommodation is needed for an "equal opportunity" to enjoy a home, 42 U.S.C. § 3604(f)(3)(B), the regulation asks whether the modification is needed "to avoid discrimination on the basis of disability," 28 C.F.R. 35.130(b)(7)(i). Given our prior assumptions, we read this text to be satisfied in this case if a plaintiff "show[s] that, 'but for' [her] disability, [she] would have been able to access the services or benefits desired." *Wis. Cmty. Servs.*, 465 F.3d at 752. Here, then, if the asphalt in chip seal would not cause Ms. Madej's reactions, the Madejs could not show that the chip seal would deny her access to the road. Without that causal connection, the Madejs' proposed modifications would not be necessary "to avoid" that non-existent denial of access.

*   *   *

In sum, while the Madejs are correct that these laws do not codify a toxic-tort regime, the laws require proof of causation all the same. This conclusion—that the Madejs must prove that the chip seal will cause Ms. Madej harm—leads to one final question: Did the district court correctly hold that they needed expert causation testimony to survive summary judgment? *See Madej*, 2018 WL 5045768, at *14. Courts have been unclear about whether this question raises a matter of substance (and so depends on the meaning of the federal laws) or a matter of procedure (and so depends on the meaning of Federal Rule of Civil Procedure 56). *Cf. Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).

On the one hand, some cases seem to treat this question as substantive by asking whether the plaintiff's claim should be read to require expert testimony. When considering tort suits under our diversity jurisdiction, for example, we have held that a party needs expert causation testimony if a state supreme court has imposed that mandate on its courts. *Vaughn v. Konecranes, Inc.*, 642 F. App'x 568, 578 (6th Cir. 2016); *Pluck*, 640 F.3d at 677; *Kolesar v. United Agri Prods., Inc.*, 246 F. App'x 977, 981–82 (6th Cir. 2007). While these cases overlook this initial process-versus-substance question, other courts that have addressed the question have likewise found it substantive. *See Wallace v. McGlothan*, 606 F.3d 410, 419 (7th Cir. 2010); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 227 F. Supp. 3d 452, 467–69 (D.S.C. 2017), *aff'd* 892 F.3d 624, 646 (4th Cir. 2018). Under this view, whether

the Madejs need expert causation evidence would turn on our interpretation of their two federal claims.

On the other hand, none of these cases accounts for *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010). That decision directs courts to consider "whether the Federal Rules of Civil Procedure answer the question in dispute" before analyzing anything else. *Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019). And Rule 56 does have something to say on a question about the evidence needed to create a fact issue for trial. *Cf. McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58, 60 (7th Cir. 1990). After all, it says that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this view, the requirement that the Madejs offer expert causation evidence would turn on whether only that kind of evidence can create a factual dispute that we would consider "genuine" under Rule 56.

We leave this issue for another day too. The Madejs' counsel conceded at oral argument that they do not challenge the district court's ruling that they need expert testimony on causation to survive summary judgment. If the court properly found their experts unreliable, it correctly granted summary judgment on their federal claims. We end with that reliability ruling.

## B. Reliability

Two general factors (one about the standard of review, the other about precedent) show that the Madejs face a daunting task in challenging the district court's conclusion that their three doctors provided unreliable opinions under Federal Rule of Evidence 702. Start with the standard of review. District courts have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," *Kumho Tire*, 526 U.S. at 152, and so we will review that type of decision only for an abuse of discretion, *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 248 (6th Cir. 2001). This deferential standard makes sense because *Daubert* establishes a "flexible" test that considers many indicia of reliability, some of which may have more relevance than others depending on the particular science and the

particular scientist before the court.  *Kumho Tire*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 594).

Turn to precedent.  The Madejs' doctors based their opinions that asphalt would harm Ms. Madej in large part on their views that she suffers from multiple chemical sensitivity.  Many courts have held that similar expert testimony did not pass muster under Rule 702.  As the Tenth Circuit noted, multiple chemical sensitivity "is a controversial diagnosis that has been excluded under *Daubert* as unsupported by sound scientific reasoning or methodology."  *Summers v. Mo. Pac. R.R. Sys.*, 132 F.3d 599, 603 (10th Cir. 1997); *see, e.g.*, *Bradley v. Brown*, 42 F.3d 434, 438 (7th Cir. 1994); *Snyman v. W.A. Baum Co.*, No. 04 Civ. 2709, 2008 WL 5337075, at \*1 (S.D.N.Y. Dec. 22, 2008), *aff'd* 360 F. App'x 251 (2d Cir. 2010); *Gabbard v. Linn-Benton Hous. Auth.*, 219 F. Supp. 2d 1130, 1134 (D. Ore. 2002), *aff'd sub nom. Wroncy v. Ore. Dep't of Transp.*, 94 F. App'x 559 (9th Cir. 2004); *Comber v. Prologue*, No. 99-2637, 2000 WL 1481300, at \*4–5 (D. Md. Sept. 28, 2000); *Coffey v. Cty. of Hennepin*, 23 F. Supp. 2d 1081, 1086 (D. Minn. 1998); *Zwillinger v. Garfield Slope Hous. Corp.*, No. CV 94–4009, 1998 WL 623589, at \*21–22 (E.D.N.Y. Aug. 17, 1998); *Coffin v. Orkin Exterminating Co., Inc.*, 20 F. Supp. 2d 107, 110–11 (D. Me. 1998); *Frank v. State of New York*, 972 F. Supp. 130, 133–37 (N.D.N.Y. 1997); *Sanderson v. Int'l Flavors and Fragrances Inc.*, 950 F. Supp. 981, 1001–02 (C.D. Cal. 1996); *see also Kuxhausen v. Tillman Partners, L.P.*, 197 P.3d 859, 862–68 (Kan. Ct. App. 2008), *aff'd* 241 P.3d 75 (Kan. 2010).

To prevail, therefore, the Madejs must establish that the district court abused its discretion by declining to shun a mountain of precedent.  That is a tall order.  To be sure, most of these cases are over a decade old.  That could be significant because "[s]cientific conclusions are subject to perpetual revision."  *Daubert*, 509 U.S. at 597.  But "[l]aw lags science; it does not lead it."  *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010) (citation omitted).  And the Madejs have not shown that more recent scientific advancements have led the scientific community to come to accept a multiple-chemical-sensitivity diagnosis, one of the relevant reliability factors.  *See Kumho*, 526 U.S. at 150.  Instead, their own doctors acknowledged that the diagnosis remains unrecognized by the American Medical Association and unlisted in the

World Health Organization's International Classification of Diseases. *Madej*, 2018 WL 5045768, at *9.

Reviewing the district court's decision against this general backdrop, we find no reversible error in its exclusion of the opinions of the Madejs' three experts on more fact-specific grounds.

1. *Dr. Molot.* We begin with Dr. John Molot, the Madejs' expert. The district court could reasonably conclude that his causation opinion was not "based upon sufficient facts or data" or the "product of reliable principles and methods . . . applied . . . reliably to the facts of the case." *Tamraz*, 620 F.3d at 670 (quoting Fed. R. Evid. 702(b)–(d)); *see Madej*, 2018 WL 5045768, at *5–8. Courts have repeatedly found opinions unreliable when they were based more on an expert's "subjective belief" than on an objective method that can be tested. *Tamraz*, 620 F.3d at 670 (quoting *Daubert*, 509 U.S. at 590); *see, e.g.*, *Nelson*, 243 F.3d at 254; *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). As we have said, "[t]he '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion." *Tamraz*, 620 F.3d at 671 (citation omitted).

Dr. Molot's opinion shares this defect. He opined that asphalt would cause Ms. Madej to suffer harmful reactions. When asked to list the chemicals that cause those reactions, however, he responded: "I have no idea, because there's no way to test it. We can't test. And I get asked that question, well, which chemicals is it exactly, do you think? Nobody knows, including me." He thus did not observe Ms. Madej display any sensitivity to asphalt because he did not conduct any objective tests. Instead, he reaches his opinions about the chemicals causing a patient's harmful reactions based "[o]nly from the history of what the patient identifies"; that is, his opinions rest "strictly on a subjective criteria of history and reported symptoms." He also conceded that he controls for the possibility that other chemicals might be the true root of a patient's reactions based on the patient's own self-reporting: "How do you control for that? You know, patients make their observations based on, I smelled this and it makes me sick. And that's all we have."

Dr. Molot's reliance on Ms. Madej's opinions gave the district court an adequate ground to find that he did not "reliably rule out" non-asphalt causes for her sensitivities. *Tamraz*, 620 F.3d at 674. Indeed, "lay speculations on medical causality, however plausible, are a perilous basis for inferring causality." *Rosen*, 78 F.3d at 318. But that sort of speculation appears to undergird Dr. Molot's opinion here. Not only that, the Madejs identify nothing suggesting that the relevant scientific community would accept this subjective method of proving causation "in their professional work." *Id.* So they failed to show that the "methodology underlying [Dr. Molot's] testimony is scientifically valid." *Daubert*, 509 U.S. at 592–93; *cf. Summers*, 132 F.3d at 604.

2. *Dr. Lieberman*. We next turn to Dr. Allan Lieberman, the environmental-medicine specialist who treated Ms. Madej from his clinic in Charleston, South Carolina. The district court could reject Dr. Lieberman's opinion that asphalt (as opposed to other items) would cause Ms. Madej's sensitivities for the same reasons that it rejected Dr. Molot's opinion. *Madej*, 2018 WL 5045768, at *10–14. Despite being Ms. Madej's treating physician for many years, Dr. Lieberman is not even sure he ever met her in person. She visited his center one time in 1999 and was seen by another doctor. *Id.* at *10. Instead, Dr. Lieberman treated Ms. Madej only over the phone. So, for the most part, Dr. Lieberman (like Dr. Molot) relied primarily on Ms. Madej's self-reporting to form his opinion concerning her sensitivities. What we have said about Dr. Molot's opinion thus fully applies to Dr. Lieberman's opinion too, with one exception.

The exception: At the initial 1999 visit, Dr. Lieberman's colleague conducted a test of Ms. Madej, and she reacted when he "plac[ed] a substance he described as 'petroleum derived ethanol' under her tongue." *Madej*, 2018 WL 5045768, at *10. Yet Dr. Molot opined that "testing for sensitivity using sublingual challenges" (under the tongue) "has not been documented as reliable for the diagnosis of chemical sensitivity." And Dr. Lieberman himself admitted that it was possible that those test results would change over time. So the district court could reasonably conclude that this decades-old test did not fill in the gap in the doctors' causation testimony.

3. *Dr. Singer*. That leaves Dr. Barbara Singer, Ms. Madej's primary-care physician. The district court did not abuse its discretion in finding her opinion unreliable because her

"qualifications" did not "provide a foundation . . . to answer" this causation question. *Berry*, 25 F.3d at 1351; *Madej*, 2018 WL 5045768, at *8–10. When a doctor's opinion "strays from" the doctor's "professional experience," the opinion is "less reliable, and more likely to be excluded under Rule 702." *Gass*, 558 F.3d at 427–28; *United States v. Farrad*, 895 F.3d 859, 884 (6th Cir. 2018). Dr. Singer's opinion fits that bill. As a primary-care physician, she conceded that "it's not my skill set to diagnose" multiple chemical sensitivity and that she does not "know the criteria for diagnosing" that trait. When asked if she tested Ms. Madej for sensitivity to asphalt, she responded: "I don't even know where we begin with that, if there are tests that are accurate for that. That's again in that chemical sensitivity specialty that I don't have." Instead, she formed her opinion that asphalt would harm Ms. Madej only "[b]ecause she had the diagnosis of multiple chemical sensitivity from Dr. Lieberman." Yet Dr. Lieberman did not actually diagnose "multiple chemical sensitivity." Unlike Dr. Molot, he does not view that phrase as a "diagnosis" since it is not a recognized disease. Instead, he calls it "a wonderful description of what the patients have" just as "headache" and "muscle pain" describe the pain that patients feel. So Dr. Singer's opinion rested not only on another doctor's views, but also on an apparent misunderstanding of those views.

\* \* \*

All told, the district court did not abuse its discretion in finding the opinions of these doctors inadmissible. Because the Madejs do not challenge the need for expert causation testimony, the absence of that evidence compels summary judgment for the Athens County Engineer. That said, we second the district court's hope that the county engineer will give the Madejs "notice far in advance of road work." *Madej*, 2018 WL 5045768, at *16. But that is all we can do. Our task is solely to answer the legal questions arising out of the parties' dispute. The policy questions about how best to reconcile the needs of the residents who travel Dutch Creek Road with the needs of Cynthia Madej are for the county engineer and the local community to whom he answers.

We affirm.