*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TABITHA MARTIN,

　　　　　　　Plaintiff-Appellant,

v

COVENANT MEDICAL CENTER, INC., doing business as COVENANT HEALTHCARE, doing business as COVENANT MEDICAL CENTER HARRISON, doing business as SAGINAW GENERAL HOSPITAL, COVENANT HEALTHCARE SYSTEM, and VASIL MAMALADZE, M.D.,

　　　　　　　Defendants-Appellees.

UNPUBLISHED
October 09, 2024
2:23 PM

No. 366356
Saginaw Circuit Court
LC No. 19-040924-NH

Before: CAMERON, P.J., and K. F. KELLY and GARRETT, JJ.

PER CURIAM.

In this medical malpractice case, we consider the trial court's ruling on the reliability of plaintiff Tabitha Martin's expert witness testimony, and its order granting summary disposition to defendants, Covenant Medical Center, Inc., Covenant Healthcare System (collectively, Covenant), and Dr. Vasil Mamaladze pursuant to MCR 2.116(C)(10). We hold that the trial court did not abuse its discretion by excluding Dr. Ruchir Gupta's testimony and that it did not err by granting summary disposition to defendants. For those reasons, we affirm.

## I. FACTUAL BACKGROUND

Martin fell and injured her knee in November 2016, and she underwent knee-replacement surgery in in May 2017. As part of the surgery, Dr. Mamaladze performed an ultrasound-guided adductor-canal block for postoperative pain control. An adductor-canal block affects the saphenous nerve, which is a sensorial nerve that does not control motor function. Dr. Mamaladze and the registered nurse who assisted him testified that Dr. Mamaladze inserted the needle at the border of the lower third and middle third of Martin's thigh. All of the doctors in this case agreed that the location of the insertion was correct to perform an adductor-canal block. Dr. Mamaladze

-1-

took two ultrasound images during the procedure, one before the medication was injected and one after.

Martin testified at her deposition that she remembered waking from surgery and stating that she could not feel her leg. According to Martin, that day and the following day, she could not lift her feet or legs. She further stated that she could not raise her feet off the ground or do anything else with them. Martin also testified that she reported these problems to her nurses.

In contrast, Martin's medical records disclosed that, on the day of the surgery and the day after, Martin "ambulated" to the bathroom with assistance.[1] Her medical record also stated that, at a physical therapy session, Martin's circulation, motor function, and sensation were intact. At a two-week postoperative visit, Martin had full knee-extension and "50 flexion." But in June 2017, Martin's medical record indicated she had zero extension, 70 flexion, and could not contract her right quadriceps muscle. An electromyography (EMG) report showed that Martin had femoral-nerve palsy.[2] For purposes of this appeal, no party disputes that Martin suffers from femoral-nerve palsy.

In December 2020, Dr. Shawn Achtman conducted an independent medical evaluation and reported that Martin had "0/5 hip flexion on right" and "knee extension 4/5 on the right." Dr. Achtman concluded that Martin "developed a right femoral nerve palsy status post right total knee arthroplasty" in May 2017. Dr. Achtman testified that, although Martin's EMG showed femoral-nerve palsy, he could not determine the likely cause.

Martin filed her medical malpractice complaint against Dr. Mamaladze and Covenant in November 2019. In December 2021, defendants moved for summary disposition under MCR 2.116(C)(10). Defendants took the position that Martin's femoral nerve injury was located at a point before the nerve bifurcated (i.e., branched) into the adductor canal. Given that location, defendants maintained that it was anatomically impossible for Dr. Mamaladze to strike Martin's femoral nerve while performing an adductor-canal block, that no medical literature or reliable science supported Martin's claim that an adductor-canal block could cause femoral-nerve palsy, and that Martin's expert, Dr. Gupta, admitted that he had never heard of a diagnosis of femoral-nerve palsy resulting from an adductor-canal block. Defendants further argued that, because Martin could not demonstrate with any medical reliability that an adductor-canal block can cause femoral-nerve palsy, she could not show that defendants' alleged negligence caused her injury. In the alternative, defendants requested an evidentiary hearing pursuant to *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993) for the court to consider the reliability of Dr. Gupta's opinion testimony on the cause of Martin's femoral-nerve palsy.

---

[1] When referring to a patient, to be ambulatory is to be "able to walk about and not bedridden." *Merriam-Webster's Collegiate Dictionary* (11th ed).

[2] As described in an article admitted at the evidentiary hearing, electrodiagnostic studies, such as an EMG, "can locate the injury, but they do not determine what caused the injury." H. David Hardman, M.D., *Evaluation and Management of Neurological Complications after Peripheral Nerve Block*, 42 No 18 (Current Rev for Nurse Anesthetists) (2020), at 224.

The trial court conducted a *Daubert* hearing and, in a written opinion and order, ultimately ruled that Dr. Gupta's testimony did not meet standards of reliability and was, therefore, inadmissible. MRE 702; MCL 600.2955. In the same opinion and order, the trial court granted defendants' motion for summary disposition. Martin now appeals the trial court's order.

## II. STANDARDS OF REVIEW

We review for an abuse of discretion a trial court's decision regarding an evidentiary issue, including whether the court properly determined that a proposed expert's testimony was unreliable and inadmissible. *Danhoff v Fahim*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 163120); slip op at 11. A trial court abuses its discretion when it makes an error of law or if its decision "falls outside the range of reasonable and principled outcomes." *Id*. at ___; slip op at 11 (quotation marks and citation omitted). This Court reviews de novo a trial court's interpretation of statutes and the rules of evidence. *Id*. at ___; slip op at 10. When reviewing an issue de novo, "this Court independently reviews the issue without deference to the lower court." *Id*. at ___; slip op at 10.

## III. LEGAL STANDARDS

The Michigan Supreme Court addressed the standards applicable to expert testimony in medical malpractice cases in *Danhoff*:

> A plaintiff in a medical malpractice action bears the burden of establishing (1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. [*Danhoff*, ___ Mich at ___; slip op p 11.]

"Generally, medical malpractice claims require expert testimony regarding the appropriate standard of care and causation." *Dorsey v Surgical Institute of Mich, LLC*, 338 Mich App 199, 231; 979 NW2d 681 (2021). The proponent of the expert's opinion has the burden to establish its relevance and admissibility. *Danhoff*, ___ Mich at ___; slip op pp 11-12. When the parties do not dispute the relevance of the expert's opinion, the court's focus is on the reliability of the testimony under MCL 600.2955 and MRE 702. *Id*. at ___; slip op p 12.

Michigan has adopted the test for reliability articulated by the United States Supreme Court in *Daubert*, 509 US 579, which is incorporated into MRE 702. *Id*. at ___; slip op p 12. Under the *Daubert* test, the trial court must "make a preliminary assessment of whether the proposed expert's testimony is scientifically valid and whether the reasoning and methodology upon which the expert bases their testimony can be applied to the facts in the case." *Danhoff*, ___ Mich at ___; slip op p 13. A court engaged in this inquiry is acting as a gatekeeper. *Id*. at ___; slip op p 18.

At the time of the trial court's opinion in this case, MRE 702 provided as follows:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product

-3-

of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 US at 595.

MCL 600.2955 provides further guidance regarding the admissibility and reliability of medical-expert testimony. *Danhoff*, ___ Mich at ___; slip op p 15. MCL 600.2955 states, in pertinent part, as follows:

(1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

Not all of the factors listed in MCL 600.2955(1) may be relevant in every case. *Elher v Misra*, 499 Mich 11, 27; 878 NW2d 790 (2016). Further, our Supreme Court has emphasized that the ultimate determination of reliability is within the trial court's discretion:

[E]ven though the United States Supreme Court has stated that, in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," the Court has also stated that even in those cases, the *Daubert* factors can be helpful,

-4-

even if all of the factors may not necessarily apply in determining the reliability of scientific testimony. Accordingly, it bears repeating that it is within a trial court's discretion how to determine reliability. [*Id.* at 25 (citations omitted).]

It is not sufficient to rely only on the expert's experience and background to establish the reliability of the expert's opinion. *Danhoff*, ___ Mich at ___; slip op p 18.

## IV. DISCUSSION

Martin argues that the trial court erred by striking Dr. Gupta's testimony because it focused on his conclusions rather than his methods, and that the trial court made findings of fact and assessed Dr. Gupta's credibility rather than considering the scientific basis for his opinions. The record does not support Martin's claims.

## A. TESTIMONY

At the *Daubert* hearing, Dr. Gupta testified that he did not know the exact location of the needle during the adductor-canal block because the needle tip did not appear in the ultrasound image but, according to Dr. Gupta, the needle could have gone out of plane and "further north" than intended. Dr. Gupta further testified that he relied on Martin's assertion that she could not lift her leg the next day, which was not consistent with her medical records.

Dr. Gupta also testified that the report from Martin's EMG supported his opinion. Dr. Gupta initially stated that the report did not identify where Martin's injury was located, but he later agreed that the EMG report stated that there was an injury to the femoral nerve located in Martin's pelvic area. Dr. Gupta believed, however, that the injury happened closer to the groin area. When asked at the *Daubert* hearing whether Martin's medical records referred to her pelvic area, Dr. Gupta opined that the term "pelvic area" was subjective.

Dr. Gupta testified that he based his opinion that Martin's injury occurred during the adductor-canal block on the differential-diagnosis technique. He agreed that making a differential diagnosis requires considering a patient's symptoms to determine possible causes and that it is important to form a wide differential in order to exclude other possible diagnoses before making a final determination. He agreed that differential diagnoses for Martin's condition included trauma at the nerve root, a retroperitoneal hematoma, or a fluid collection along the psoas muscle. He also explained how he ruled out each of those possible causes.

But when asked whether any other autoimmune or chronic health conditions could cause peripheral neuropathy, Dr. Gupta testified that this was outside his area of expertise. He further testified that he had not ruled out neuromuscular disorders, that he was not an expert in neuromuscular disorders, but that an isolated femoral-nerve palsy would not be caused by a neuromuscular disorder. When questioned whether he asked Martin if she suffered from meralgia

paresthetica, Dr. Gupta testified, "I didn't ask for any of those records."[3]  Dr. Gupta testified at his deposition that he did not examine Martin and had no plans to do so, and he agreed that he had not reviewed certain records, including those of Martin's primary-care physician or her pain-recovery clinic.  Dr. Gupta testified that he did not remember how tall Martin was and that he did not know how much Martin weighed.  Dr. Gupta opined that Martin's weight was not important.[4]

Dr. Gupta testified at his deposition, "I don't have any literature or case study that I would look at.  I'm just looking at common sense.  It's a known complication that if you do not have good visualization of the needle, it can damage surrounding structures."  At the *Daubert* hearing, Dr. Gupta agreed that he did not search for case reports regarding the incidence of saphenous-nerve injury, but he stated that he was certain that such literature existed.  He further opined that medical publications and literature did not include studies of what happened when physicians performed procedures incorrectly.

Dr. James Richardson testified at the *Daubert* hearing that he was board-certified in electrodiagnostic medicine, that he predominantly conducted research regarding peripheral-nerve disorders, and that he treated patients with femoral-nerve palsy.  Dr. Richardson opined that Martin's injury could be postsurgical inflammatory neuropathy, also known as Parsonage-Turner syndrome.  Dr. Richardson described the syndrome as an autoimmune condition that affects nerve tissue.  According to Dr. Richardson, Parsonage-Turner syndrome was consistent with Martin's condition, and it did not appear that any doctor had considered postsurgical inflammatory neuropathy as part of a differential diagnosis.  Dr. Richardson also testified that having a high BMI was a risk factor for postsurgical inflammatory neuropathy.  Martin's medical records show that, at the time surgery, she was obese.  Dr. Richardson further opined that a single mechanical injury would not result in Martin's knee extensors improving when her hip extensors did not improve.

At his deposition, Dr. Mamaladze testified that he researched literature for complications related to peripheral-nerve blocks and adductor-canal blocks.  The trial court admitted those publications at the *Daubert* hearing.  Notably, the articles stated that high BMI is correlated with peripheral-nerve injury following surgery, including postsurgical inflammatory neuropathy.  Further, one article emphasized that there was no data to support that ultrasound guidance reduced the risk of neuraxial injury and that adequate images of needle-nerve interface were not consistently obtained by ultrasound operators.

---

[3] Meralgia paresthetica is caused by compression of the lateral femoral cutaneous nerve; compression of the nerve can cause numbness, tingling, pain, or a burning sensation in the outer thigh.  Johns Hopkins Medicine, *Meralgia Paresthetica* <https://www.hopkinsmedicine.org/health/conditions-and-diseases/meralgia-paresthetica> (accessed September 26, 2024).

[4] In contrast, Dr. Mamaladze testified at his deposition that obesity is a chronic, stable medical condition that is a risk-factor related to anesthesia.  Medical literature that defendants submitted during the *Daubert* hearing stated that obesity is frequently correlated with a higher incidence of femoral-nerve palsy.

## B. THE TRIAL COURT'S RELIABILITY DECISION

The trial court ultimately ruled that Dr. Gupta's opinion testimony was not reliable or admissible and the court granted summary disposition to defendants. The court observed that Dr. Gupta offered no medical literature to support his opinion and that the facts in evidence and defendants' literature contradicted his opinion regarding the cause of Martin's femoral-nerve palsy. Further, the trial court found that Dr. Gupta's theory relied on assumptions and his inability to see the needle on ultrasound images. He also based his opinion on "common sense" and stated that he did not actually know the location of the needle during Martin's procedure. The trial court also noted that Dr. Gupta chose to believe Martin's testimony over her medical records and had not reviewed or even asked to see Martin's preoperative records. The court also concluded that Dr. Gupta held himself to a higher standard of care than the general medical community by asserting that a needle must be visible at all times during an ultrasound-guided needle insertion.

The trial court considered Dr. Gupta's testimony pursuant to *Daubert* as incorporated in MRE 702 and concluded that his testimony was not based on sufficient facts or data, that his opinion was not the product of reliable principles or methods, and that he had not applied the principles and methods reliably to the facts of the case. The court reiterated that Dr. Gupta admitted numerous times that he did not read Martin's full medical records and he did not know basic facts about her condition, including her weight and BMI. The trial court found it significant that Dr. Gupta did not examine Martin or review her records because there were plausible, alternative theories of causation, like postsurgical inflammatory neuropathy, which depended on factors like the patient's BMI and medical history. The trial court also observed that Dr. Gupta based his opinion on a different doctor's interpretation of Martin's EMG report, and he founded his theory that defendants caused her injury on hypothetical needle trajectories even though medical literature stated that postsurgical inflammatory neuropathy is a possible complication of anesthetic procedures.

The court also considered whether Dr. Gupta's testimony was based on reliable principles and methods. The court noted that Dr. Gupta admitted that he was not a neurologist and did not perform EMGs. He further admitted that ultrasound-guidance videos would tell a different story than the two snapshot images he viewed that did not show the location of a needle. The court further found that Dr. Gupta gave conflicting testimony about whether hip flexion was Martin's primary deficit. Accordingly, the court concluded that Dr. Gupta's testimony was not based on reliable principles and methods.

The trial court also concluded that Dr. Gupta did not apply the principles and methods reliably to the facts of the case. Dr. Gupta did not take into account the testimony of the nurse or Dr. Mamaladze, both of whom testified that they performed the procedure in Martin's medial thigh, above the knee. Instead, Dr. Gupta speculated about the needle's entry point and his assertions about the orientation of the probe contradicted eyewitness testimony and medical literature regarding the location where adductor-canal blocks are administered. The trial court again emphasized in this analysis that Dr. Gupta did not base his differential diagnosis on Martin's medical history or a personal examination.

The court also considered the factors in MCL 600.2955 and concluded that the statute weighed heavily against Martin's evidence of causation through Dr. Gupta's testimony. Regarding

whether the basis of Dr. Gupta's opinion was subjected to scientific testing and replication, the trial court observed that Dr. Richardson explained the process of mechanical-lesion healing and that Martin's increasing function undermined Dr. Gupta's theory of causation. Accordingly, Dr. Gupta's theory was undermined by the fact that nerve injuries are capable of being replicated, tested, and observed. Regarding whether Dr. Gupta could identify literature to support his opinion, he did not find, and had not tried to find, any such support. When considering the existence and maintenance of generally accepted standards governing the method or technique, the court reiterated that Dr. Gupta described a different standard than the general medical community.

The trial court further considered that Dr. Gupta could not identify an error rate in his opinion or its basis and that it would have been helpful for Martin to provide a statistic regarding how often femoral-nerve complications resulted from adductor-canal blocks. Considering whether Dr. Gupta's opinion and its basis were generally accepted in the expert community, the trial court noted that Dr. Gupta testified that he thought that the anesthesia community was highly supportive of his position, but that defendant's experts and the medical literature disagreed with Dr. Gupta's assertions about the purpose of ultrasound guidance and whether it was possible to always visualize a needle on an ultrasound.

The trial court was also not convinced that another expert in the field would rely on Dr. Gupta's differential diagnosis. Although the trial court concluded that differential diagnosis is a valid scientific method, it opined that Dr. Gupta merely described his method as a differential diagnosis, but his testimony did not support it. The trial court reiterated that Dr. Gupta based his diagnosis on another doctor's EMG assessment and Martin's self-reported symptoms, he could not rule out neuromuscular causes, and his diagnosis did not take Martin's preoperative medical history into consideration. The court opined that Dr. Gupta's differential diagnosis was incomplete and that it seemed that he created it for purposes of litigation.

Ultimately, as discussed, the trial court granted defendants' motion to strike Dr. Gupta as a proposed expert witness and granted defendants' motion for summary disposition.

## C. ANALYSIS OF RELIABILITY

Again, the proponent of an expert witness must establish that the expert's "testimony is based on sufficient facts or data." MRE 702(b).[5] In this case, the trial court focused on whether Dr. Gupta's opinion was based on sufficient facts in the record. Dr. Gupta admitted that he did not read Martin's full medical record, that he did not examine Martin, and that he did not know Martin's full medical history. The trial court was also concerned that Dr. Gupta did not know basic facts about Martin, including Martin's BMI, which ample evidence showed could lead to complications like Martin's following anesthetic procedures. The trial court also noted that Dr.

---

[5] As noted, the Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See 512 Mich lxiii (2023). We rely on the version of MRE 702 in effect at the time this matter was decided.

Gupta based his opinion on a different doctor's interpretation of Martin's EMG report and not his own first-hand interpretation.

Martin contends that the basis for Dr. Gupta's opinion was his knowledge, training, education, and experience. Martin is correct that the record reflects that Dr. Gupta has considerable knowledge, training, and experience. But, as our Supreme Court made clear in *Danhoff*, standing alone, an expert's knowledge, training, and experience is not a sufficient basis to establish the reliability of the expert's opinion. See *Danhoff*, ___ Mich at ___; slip op p 18. Rather, Martin's argument on this ground encompasses only one of many factors the court should, and did, consider when determining whether to admit the testimony of a proposed expert.

Martin also argues that, contrary to the trial court's ruling, Dr. Gupta's opinion was based on objective facts, including the absence of a visible needle tip in the two still ultrasound images. We disagree.

The record amply supports the trial court's conclusion that Dr. Gupta's opinion was based on speculation. Dr. Gupta opined that, during the adductor-canal block, it was more likely than not that Dr. Mamaladze's needle inadvertently entered Martin's femoral nerve before the nerve bifurcated. Dr. Gupta testified that he thought that Dr. Mamaladze could have hit Martin's femoral nerve before it bifurcated because he did not know exactly where Dr. Mamaladze inserted the needle, he could not see the needle tip in the ultrasound images, and Dr. Mamaladze could have gone out of plane and "further north" than intended. Dr. Gupta testified that he based his opinion on the absence of the needle tip appearing in two still ultrasound images and Martin's subjective complaints following surgery. During his deposition, Dr. Gupta admitted that he did not know the actual location of the needle tip and that there was no picture evidence showing its location. Similarly, Dr. Gupta testified at the *Daubert* hearing that he could not see the needle tip and did not know where it was. He opined that, "in the grand scheme of everything that has happened and the complaints of the patient . . ." he believed the needle was in a different location because he did not see "a picture of where [Dr. Mamaladze] went." The trial court did not err by concluding from this testimony that Dr. Gupta was speculating about the location of the needle.

The trial court also did not err by concluding that Dr. Gupta did not base his opinion on the facts of the case, including testimony about the procedure, testimony and literature about anatomy, and the location on Martin where Dr. Mamaladze performed the adductor-canal block. Dr. Gupta testified that the proper place to perform an adductor-canal block is the mid-thigh, which is consistent with the testimony of defendant's expert, Dr. John Pappas. Further, both Dr. Mamaladze and the registered nurse who assisted in the procedure testified that this was where Dr. Mamaladze inserted the needle on Martin. When counsel asked Dr. Gupta whether there was a way to determine whether the femoral nerve was punctured before bifurcating, Dr. Gupta responded that a patient's symptoms would support that determination and that he did not know of any imaging that could show whether the needle hit the femoral nerve. Again, the record supports the trial court's opinion that Dr. Gupta speculated about the location and trajectory of the needle.

Martin contends that the trial court erred by concluding that Dr. Gupta held himself to a higher standard of care than other medical professionals regarding whether the tip or shaft of the needle must be visible on the ultrasound during the entire procedure. Martin argues that this was

erroneous because the trial court relied on a medical article from 2015. Martin has provided no legal support for her argument that the trial court could not or should not rely on medical literature from 2015, which stated that not all operators could obtain adequate images of the interface between the ultrasound needle and the nerve. In any case, the medical literature was consistent with testimony at the *Daubert* hearing.

Dr. Gupta himself agreed that an ultrasound video is an entire process, that a person performing an out-of-plane approach would only see the tip of the needle, and that an out-of-plane approach was consistent with the standard of care. Further, defendants' expert also testified at the *Dabuert* hearing that the needle was not visible during the entire procedure but rather came "in and out of focus as compared to the ultrasound probe." We do not agree that the trial court erred by ruling that Dr. Gupta held himself to a higher standard of care than the general medical community by opining that the needle needed to be visible on the ultrasound at all times.

Martin further asserts that the trial court erred because Dr. Gupta properly based his opinion on Martin's testimony. The record shows that, to the contrary, Dr. Gupta did not sufficiently base his opinion on facts related to Martin.

The trial court concluded that Dr. Gupta did not consider sufficient facts or data because he admitted that he did not read Martin's medical records, he lacked knowledge of basic facts about Martin, and he relied on another doctor's interpretation of Martin's EMG. Dr. Gupta testified that he based his opinion on Martin's medical records and deposition testimony but, contrary to Martin's later assertions, Martin's medical records stated that she was able to walk with assistance after surgery and that her knee flexion improved. Dr. Gupta countered that medical records are not objective data and he speculated that medical professionals must have ignored Martin's complaints. Regarding Martin's EMG report, he testified inconsistently that the report did not state where the injury occurred and that the report stated that the injury occurred in Martin's groin.

According to Martin, the trial court should not have discounted Dr. Gupta's testimony merely because he did not personally examine her. This assertion takes one part of the trial court's rationale out of context which we decline to do. *Graziano v Brater*, 342 Mich App 358, 367; 994 NW2d 521 (2022). Further, contrary to Martin's assertion, Dr. Gupta's failure to examine Martin was one of many of reasons the trial court found Dr. Gupta's testimony unreliable, and we decline to address this statement out of context.

To the extent Martin asserts that the trial court erred by comparing Dr. Gupta's opinions about the EMG report with Dr. Richardson's, this argument also lacks merit. A trial court may consider, among other things, that an expert's opinion was contradicted by the opinion of another party's expert, if the opinion was contradicted by published literature on the subject, or if no literature admitted into evidence supported the expert's testimony. *Elher*, 499 Mich at 28. A trial court is permitted to compare the testimony of different experts, as it did in this case.

Finally, we note that Martin does not discuss numerous other factors that a court may consider, and that the trial court did consider in this case when determining that Dr. Gupta's opinion was unreliable. The trial court considered whether Dr. Gupta's theory was subjected to scientific testing and replication, consistent with MCL 600.2955(1)(a); that Dr. Gupta had not

presented an error rate for his opinion, consistent with MCL 600.2955(1)(d); and whether the basis for Dr. Gupta's opinion was generally accepted in the expert community, consistent with MCL 600.2955(1)(e). Martin has not challenged the court's considerations or conclusions regarding any of these additional factors.

## D. HEARSAY AND RELIANCE ON LITERATURE

Martin argues that the court should not have relied on the medical literature that defendants introduced because it was hearsay that may only be used for impeachment purposes. This argument is flawed because the court is not bound by all rules of evidence when making a preliminary evidentiary ruling.

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Former MRE 801(c).[6] Generally, during cross-examination, statements in a treatise, periodical, or pamphlet may be used for impeachment purposes, but the treatise may not be admitted as an exhibit. Former MRE 707.[7] However, the trial court may answer preliminary questions concerning the admissibility of evidence, and when doing so, it is not bound by other rules of evidence except those related to privilege. Former MRE 104(A). The medical literature in this case is not related to privilege, and accordingly, the general hearsay rules did not preclude the trial court from considering it for the preliminary purpose of determining whether Dr. Gupta's testimony was admissible. Further, the trial court's consideration of the literature that the parties admitted during the *Daubert* hearing is consistent with opinions of the Michigan Supreme Court. See *Edry v Adelman*, 486 Mich 634, 640; 786 NW2d 567 (2010) (noting that the expert's testimony was contradicted by defendant's expert and published literature); *Elher*, 499 Mich at 28 (same). There is no basis from which to conclude that the general rule that permits the trial court to consider evidence that would be otherwise inadmissible when ruling on the admissibility of evidence does not apply under these circumstances.

Plaintiff also argues that the trial court erred by discounting Dr. Gupta's opinion because peer-reviewed, published literature is not always necessary for admission of an expert's opinion under former MRE 702. However, the trial court's opinion clearly stated that this was not a determining factor in its decision.

---

[6] As noted, the Michigan Rules of Evidence were substantially amended effective January 1, 2024. See 512 Mich lxiii (2023). Although the specific language of MRE 801(c) changed, no party argues that the amended language altered the hearsay rule applicable at the time of the court's May 11, 2023 opinion. The current language also appears to be consistent with historical applications of the hearsay rule. See, e.g., *People v Musser*, 494 Mich 337, 350; 835 NW2d 319 (2013).

[7] Again, the language of MRE 707 was substantially altered by the recent updates to the Michigan Rules of Evidence. However, the current language appears consistent with historical applications of the learned-treatise rule. See, e.g., *Hilgendorf v St John Hosp & Med Ctr Corp*, 245 Mich App 670, 701-705; 630 NW2d 356 (2001).

Again, it is well-established that the appellant must address the basis of the trial court's decision. *Derderian*, 263 Mich App at 381. In this case, the court *explicitly stated* that "[p]eer reviewed, published literature is not always necessary or sufficient to meet the requirements of MRE 702, but the lack of supporting literature, combined with his singular reliance on his own hypothetical and speculative depiction, renders Dr. Gupta's opinion unreliable and inadmissible under MRE 702." The trial court determined that Dr. Gupta had not addressed whether his opinion or its basis was subjected to peer review publication. The trial court observed that Dr. Gupta was unable to identify any supporting literature, he admitted that he did not try to find any, and that he did not address the literature defendants provided; instead, Dr. Gupta conjectured that literature might potentially exist. We conclude that the trial court applied the correct standard, and rather than basing its holding on a lack of literature supporting Dr. Gupta's opinion, it based its decision in part on Dr. Gupta's failure to attempt to look for literature or to address the literature that defendants introduced.

Martin makes a cursory argument that the trial court erred by relying on articles that were released before the ultrasound technique at issue was used, but this argument is inaccurate. The trial court relied on an article released by the American Society of Regional Anesthesia and Pain Medicine in its September-October 2015 volume regarding the possible neurological complications associated with regional anesthesia. Joseph M. Neal, M.D., et al, *The Second ASRA Practice Advisory on Neurologic Complications Associated with Regional Anesthesia and Pain Medicine*, 40 No. 5 (Am. Soc'y of Regional Anesthesia & Pain Med.) (September-October 2015). The journal specifically stated that ultrasound guidance was not associated with a reduction of long-term peripheral-nerve injury. *Id*. at 417. It also stated that "[t]here are *no data to support the concept that ultrasound guidance of needle placement reduces the risk of neuraxial injury* in patients under general anesthesia or deep sedation." *Id*. at 416 at Table 10 (emphasis in original). It further stated that "[c]urrent ultrasound technology does not have adequate resolution to discern between" injections in and outside the nerve and that "[a]dequate images of needle-nerve interface are not consistently obtained by all operators and in all patients." *Id*. at 416 at Table 11. The article concluded that there was no evidence that ultrasound monitoring prevented peripheral-nerve injury. *Id*. at 417. As can be seen from this very brief summary, this article extensively addresses ultrasound guidance. To the extent that Martin takes exception to the age of the article, we have already addressed this point.

E. DIFFERENTIAL DIAGNOSIS

Plaintiff argues that Dr. Gupta's use of the differential-diagnosis technique rendered his causation opinion reliable. We hold that the trial court did not err by recognizing that the differential-diagnosis technique is a valid scientific method but that Dr. Gupta did not reliably apply that method to reach his opinion.

Former MRE 702 required the proponent of the expert testimony to establish, among other things, that "the testimony is the product of reliable principles and methods" and that "the witness has applied the principles and methods reliably to the facts of the case." This Court has recognized that differential diagnosis "is simply a method by which all possible causes of a condition are listed and then the various causes are ruled out so as to leave the most likely cause or causes of a

particular patient's problem." *Dengler v State Farm Mut Ins Co*, 135 Mich App 645, 649; 354 NW2d 294 (1984).[8]

Similarly, federal courts have recognized the method of differential diagnosis. The decisions of federal courts of appeal are not binding on this Court but may be considered for their persuasive value. *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004). Federal courts have acknowledged that "[d]ifferential diagnosis is a common scientific technique, and federal courts, generally speaking, have recognized that a properly conducted differential diagnosis is admissible under *Daubert*." *Clausen v M/V NEW CARISSA*, 339 F3d 1049, 1057 (CA 9, 2003). However, "[s]imply claiming that an expert used the 'differential diagnosis' method is not some incantation that opens the *Daubert* gate." *Tamraz v Lincoln Elec Co*, 620 F3d 665, 674 (CA 6, 2010), quoting *Bowers v Norfolk S Corp*, 537 F Supp 2d 1343, 1360 (MD Ga, 2007). A court should consider whether an expert accurately diagnosed the disease, reliably considered and ruled in the possible causes, and reliably considered and ruled out the rejected causes. *Tamraz*, 620 F3d at 674. These decisions are consistent with former MRE 702, which requires a court to consider whether the testimony is the product of reliable principles and methods *and* whether the expert applied that method reliably to the facts of the case.

In this case, the trial court did not reject differential diagnosis as a valid scientific technique. Instead, the trial court found that Dr. Gupta's application was flawed because his differential diagnosis was not comprehensive and was, instead, incomplete. As discussed, the trial court reasoned that Dr. Gupta did not know basic facts about Martin and that he did not personally examine her or review all of her records. This was significant in light of alternative, plausible theories of causation, including postsurgical inflammatory neuropathy, which required knowing a patient's BMI and complete medical history. The trial court also noted that Dr. Gupta did not rule out other types of lesions on the femoral nerve and had not asked to review her preoperative records to determine if she was suffering from meralgia paresthetica.

Again, the trial court's rulings are supported by the record. Dr. Gupta agreed that it was important to have a wide differential when making a differential diagnosis. He testified that he ruled out diagnoses of trauma at the nerve root, a retroperitoneal hematoma, or a fluid collection along the psoas muscle. However, when asked whether any other autoimmune or chronic health conditions could cause peripheral neuropathy, Dr. Gupta testified that that was outside his area of expertise. However, the record reflects that an autoimmune condition exists that could have caused Martin's injury, as mentioned in two of the articles provided by defendants, and as explained by Dr. Richardson. It is irrelevant whether this condition in fact caused Martin's injury; the question is whether this potential cause was recognized and ruled out as part of Dr. Gupta's differential diagnosis. But Dr. Gupta did not consider autoimmune disorders, he testified that he was not an

---

[8] We acknowledge that this Court should not treat an opinion decided before November 1, 1990, as binding. *Stegall v Resource Tech Corp*, ___ Mich ___, ___ n 10; ___ NW3d ___ (2024) (Docket No. 165450); slip op p 18 n 10. However, important prudential considerations, such as the length of time since an opinion was issued and public reliance, may support this Court following a decision released before this date. *2000 Baum Family Trust v Babel*, 488 Mich 136, 180 n 26; 793 NW2d 633 (2010). We have found no basis to depart from *Dengler*.

-13-

expert on neuromuscular disorders, and he did not address the risks of the chronic health condition of morbid obesity, which plaintiff had at the time of her surgery. Scientific literature supported that a patient's BMI is an important risk factor related to anesthesia. However, Dr. Gupta did not know how tall Martin was or how much she weighed, and he instead opined that her weight was not important.

On the basis of the record evidence, the trial court's conclusion that Dr. Gupta did not conduct a sufficiently reliable differential diagnosis was well within the range of principled outcomes. *Danhoff*, ___ Mich ___; slip op at 11. In order to effectively rule out other possible causes of a plaintiff's injury, those possibilities must be considered, and Dr. Gupta did not consider all possible causes of plaintiff's peripheral-nerve injury. Accordingly, the trial court did not err by ruling that Dr. Gupta did not reliably apply the differential-diagnosis technique to the facts of this case.

## F. PREMATURITY

Martin argues that defendants' request to strike Dr. Gupta's testimony was premature because it will be confirmed by additional evidence at trial. Contrary to this argument, numerous cases establish that an expert's testimony may be stricken and summary disposition may be granted before trial. See, e.g., *Elher*, 499 Mich at 28; *Edry*, 486 Mich at 640. Martin had the opportunity to develop the record through depositions, documents, and testimony at the *Daubert* hearing. Further, if a plaintiff must be allowed to present witnesses and evidence at trial before an expert's proposed testimony may be stricken, the *Daubert* hearing has no purpose.

## IV. CONCLUSION

Ultimately, the trial court's decision that Dr. Gupta's causation testimony was inadmissible did not result from an error of law or fall outside the range of principled outcomes. The trial court issued a thorough opinion considering both MRE 702 and MCL 600.2955(1), and it did not find facts or attempt to determine scientific truth in its opinion. Instead, the trial court fulfilled its role as gatekeeper after determining that Dr. Gupta's proposed testimony was not based on reliable scientific principles and methods that had been reliably applied to the facts of Martin's case.

Martin's argument that the trial court erred by granting summary disposition under MCR 2.116(C)(10) is entirely reliant on her argument that the trial court improperly struck Dr. Gupta's testimony. Accordingly, this argument also fails.

Affirmed.

/s/ Thomas C. Cameron
/s/ Kirsten Frank Kelly
/s/ Kristina Robinson Garrett

-14-